UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------------x
In re:

1111 MYRTLE AVENUE GROUP LLC,                    Case No. 15-12454 (MKV)

                           Debtor.
----------------------------------------------------------------------x
1111 MYRTLE AVENUE GROUP LLC,

                        Plaintiff-Seller,        Adv. Pro. No.
                                      15-01348 (MKV)

      – against –

MYRTLE PROPERTY HOLDINGS LLC,

                        Defendant.
----------------------------------------------------------------------x
MYRTLE PROPERTY HOLDINGS LLC,

                        Counter-Claimant,

      – against –

1111 MYRTLE AVENUE GROUP LLC,

                        Counter-Defendant.
----------------------------------------------------------------------x


**MEMORANDUM OPINION AND ORDER AFTER TRIAL**


*A P P E A R A N C E S:*

GOLDBERG WEPRIN FINKEL
GOLDSTEIN LLP
*Attorneys for the Plaintiff-Seller*
1501 Broadway, 22nd Floor
New York, New York 10036
By:   J. Ted Donovan, Esq.
      Kevin J. Nash, Esq. (argued)
      Justin Kelton, Esq.

HERRICK, FEINSTEIN LLP
*Attorneys for Defendant-Purchaser/Counter-Claimant*
*Myrtle Property Holdings LLC*
2 Park Avenue
New York, New York 10016
By:     Hanh V. Huynh
        Avery S. Mehlman (argued)

**MARY KAY VYSKOCIL**
**UNITED STATES BANKRUPTCY JUDGE**

The claims in this adversary proceeding arise out of a failed real estate transaction involving a proposed sale by the Debtor-Plaintiff 1111 Myrtle Avenue Group LLC (the "Plaintiff-Seller") to Myrtle Property Holdings LLC (the "Defendant-Purchaser") of certain real property located on Myrtle Avenue in Brooklyn, New York. The Plaintiff-Seller contends that it was at all times ready, willing, and able to close on the sale of the Property, and that the Defendant refused to close, thereby breaching the Sale and Purchase Agreement (the "Agreement"). *See* Complaint For Judgment Declaring Defendant in Default of Contract and Recovery of Liquidated Damages [ECF No. 1] ("Cmplt.") ¶¶ 32–33. By reason of the alleged breach, the Plaintiff-Seller seeks to retain the $7.5 million contract deposit as damages in accordance with the liquidated damages provision of the Agreement. Cmplt. ¶ 46. The Defendant contends that the Plaintiff-Seller improperly declared a Time of the Essence date for closing on the transfer [*see* Answer, Affirmative Defenses and Counterclaims [ECF No. 5] ("Ans.") ¶ 20], improperly sought to impose a fee for the Plaintiff-Seller's consent to an intended assignment of the Agreement [*see* Ans. ¶ 40], and otherwise failed to satisfy conditions of the sale. *See* Ans. ¶ 20. The Defendant further contends that it was ready, willing, and able to close on the purchase of the Property. *See* Ans. ¶ 30.

Defendant demands specific performance under the Agreement and money damages in an amount to be determined at trial, but no less than $35,500,000 plus interest, costs, and reasonable

2

attorneys' fees. *See* Ans. ¶ 27. At trial and in its briefing, Defendant did not focus on its claim for specific performance, and instead pressed for a return of the contract deposit, as well as unspecified damages as a result of the Plaintiff's allegedly willful misconduct. *See* Defendant's Post Trial-Brief [ECF No. 36] at 13, 25. Indeed, as framed by the Defendant-Purchaser, "[t]he central issue in this case is whether Purchaser was required to close on the sale of the Property on July 28, 2015, and whether, as a consequence of that failure, the Debtor is entitled to retain the Deposit." Defendant's Post-Trial Brief [ECF No. 36] at 1.

Both parties consented, on the record at the Final Pre-Trial Conference, to entry of final judgment by this Court. The Court held a two-day trial in this adversary proceeding and heard testimony of seven witnesses and received 50 documents in evidence.[1] *See* 8/16 Trial Tr. [ECF No. 31]; 8/17 Trial Tr. [ECF No. 33]. The findings of fact and conclusions of law set forth in this Opinion constitute the Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, made applicable to this adversary proceeding by Federal Rule of Bankruptcy Procedure 7052. In making its factual findings, the Court considered the credibility of the witnesses based on the Court's observation of their testimony and demeanor and the rest of the evidence introduced at trial.

For the reasons set forth below, the Court finds that the Defendant-Purchaser breached the Agreement by appearing at, but refusing to proceed with, the closing. Accordingly, the Plaintiff-Seller is entitled to retain the $7.5 million contract deposit as liquidated damages pursuant to the Agreement. Judgment should be entered in favor of the Plaintiff-Seller in the amount of $7.5 million and the Defendant's counter-claims should be dismissed.

---

[1] Exhibits received into evidence are referred to as "TX__." Numbered exhibits are Plaintiff-Seller's exhibits and exhibits with letter designations are Defendant-Purchaser's exhibits.

## FACTUAL BACKGROUND

The Sale and Purchase Agreement

The Plaintiff-Seller and the Defendant entered into a Sale and Purchase Agreement dated June 20, 2014 [TX 1] (the "Agreement"), pursuant to which Plaintiff-Seller agreed to sell, and Defendant agreed to purchase, a parcel of real property located at 1101, 1103, and 1123 Myrtle Avenue, Brooklyn, New York (the "Property") for $20.5 million. *See* Compl. ¶ 5; Ans. ¶ 9.  The purchase price included deposits totaling $7.5 million (collectively, the "Deposit"), [*see* TX 1 at ¶ 3; *see also* 8/16 Trial Tr. 99:3–22; 8/17 Trial Tr. 95:1–7],[2] an amount larger than and "[n]ot at all" typical for a transaction of this size. *See* 8/17 Trial Tr. 21:21–23; *see also* 8/17 Trial Tr. 95:6–11. By agreement of the parties, the Deposit was not held in escrow, but instead immediately was released to the Plaintiff.[3] The Agreement also contained a liquidated damages provision that stated that "in the event of Purchaser's material default . . . not caused by any breach of the Seller, Seller shall retain the Deposit as liquidated damages, which shall be Seller's sole and exclusive remedy at law or equity for Purchaser's default." TX 1, ¶ 15.

This dispute arises from the unconsummated scheduled closings in this case. Lurking beneath the surface of the delays in these closings were related transactions contemplated by each of the parties—first, the Plaintiff-Seller's desire to perform a "section 1031 like-kind

---

[2] *See also Debtor's Declaration Pursuant to the Local Bankruptcy Rules*, ¶ 12, ECF No. 1, Chapter 11 Case No. 15-12454.

[3] Purchaser's Mr. Brunner testified that when the Parties were negotiating the Agreement, the Seller requested the Deposit be released form escrow so it could be used to pay down the existing mortgage on the property. *See* 8/17 Trial Tr. 22:16–25. However, Aaron Ambalu, a manager of the Plaintiff-Seller [*see* 8/16 Trial Tr. 26:20–22] who served as the Seller's attorney for the transaction [*see* 8/16 Trial Tr. 26:17–19], testified that the release had nothing to do with satisfying a mortgage. *See* 8/16 Trial Tr. 61:15–17. The reason for the Parties' agreement that the Deposit need not be escrowed is not relevant to the issues before the Court.

4

exchange" (expressly contemplated by the Agreement [*see* TX 1, ¶ 22])[4] and second, the Defendant's undisclosed attempt to "flip" the Agreement to another purchaser. Relevant with respect to the issues before the Court, the Agreement contained a provision that allowed the Agreement to be assigned, but severely limited who qualified as an assignee:

> Purchaser may assign this Agreement to a newly formed limited liability company, corporation, partnership, trust or any other entity formed to take title to the Property, *owned or controlled by Abraham Mandel or Isaac/Shifra Hager.*

TX 1, ¶ 23 (emphasis added).

<u>The Attempted Closings</u>

The Agreement provided for a closing on April 30, 2015 and did not stipulate that time was of the essence. *See* TX 1, ¶ 8. In fact, the Agreement expressly allowed for the specified closing date to be adjourned. *See* TX 1, ¶ 8. The closing was initially tentatively scheduled for April 28, 2015 [*see* 8/16 Trial Tr. 38:3–8], but it did not proceed on that date. *See* 8/17 Trial Tr. 31:4–8. Joseph Brunner,[5] a principal of Defendant-Purchaser, testified that he and Simon Alishaev, the Plaintiff-Seller's principal [*see* 8/16 Trial Tr. 29:16–17], met regarding the cancellation of the April 28th closing. *See* 8/17 Trial Tr. 31:11–16. According to Mr. Brunner, the Plaintiff-Seller explained that he had used the $7.5 million Deposit for a different transaction and therefore would not qualify for a like-kind exchange under the tax code. *See* 8/17 Trial Tr.

---

[4] The Agreement expressly contemplated the performance by Plaintiff-Seller of a like-kind exchange pursuant to Internal Revenue Code § 1031, 26 U.S.C. § 1031 (2008). *See* TX 1, ¶ 22. A like-kind exchange was not a condition to the Agreement, but merely an option for the Seller. *See id.*; *see also* 8/16 Trial Tr. 32:22–33:16. The evidence at trial established that in the time frame leading up to the Agreement, the Plaintiff-Seller was negotiating with another entity to purchase a separate property, which if possible, the Plaintiff would have used to effectuate a like-kind exchange. *See* 8/16 Trial Tr. 40:22–41:11. Mr. Ambalu testified that if, however, such a deal was not feasible, the Plaintiff would have proceeded on closing the Agreement anyway. *See* 8/16 Trial Tr. 41:10–11.

[5] Mr. Brunner is a real estate developer [*see* 8/17 Trial Tr. 9:8] who, together with Abraham Mandel and Isaac Hager, had set up the Defendant entity for the purposes of purchasing the Property [*see* 8/17 Trial Tr. 13:6–23; 93:1–4].

31:16–25. However, according to the Plaintiff-Seller, the Plaintiff cancelled the closing because of the Defendant's apparent reluctance to commit to closing on the scheduled date. *See* 8/16 Trial Tr. 50:10–12; 52:19–53:2; *see also* 8/17 Trial Tr. 31:9–13; TX 40.

By agreement of the Parties, the closing was rescheduled for some time in May 2015. *See* 8/17 Trial Tr. 32:6–17. Mr. Brunner testified that shortly before the second scheduled closing in May 2015, he and his partner, Abraham Mandel, met with Seller's Mr. Alishaev. *See* 8/17 Trial Tr. 32:18–33:1. At the meeting, Mr. Alishaev indicated he was going to get a loan in order to replace the Deposit amount now spent on another transaction and requested an extension of time until the end of July. *See* 8/17 Trial Tr. 33:3–8; *see also* 8/16 Trial Tr. 32:13–19. Mr. Brunner testified that he neither agreed nor disagreed with giving an extension. *See* 8/17 Trial Tr. 33:9–19. According to Mr. Brunner, Defendant-Purchaser was ready to close at that point [*see* 8/17 Trial Tr. 33:10–12],[6] but he "was trying to be as reasonable [as he] c[ould be] and [he] was very understanding of the circumstances that [Mr. Alishaev] was in at that time." 8/17 Trial Tr. 33:12–14. Thus the parties put off the closing for two months, apparently without objection. *See* 8/16 Trial Tr. 59:8–14; *see also* TX 11 at 4. Mr. Brunner testified that, as of the time leading up to the May 2015 closing, the Defendant-Purchaser did not plan to assign the Agreement, and was preparing to close directly with the Plaintiff [*see* 8/17 Trial Tr. 32:9–14], although other evidence discussed below refutes this claim.[7] While Defendant-Purchaser's main witness, Mr. Brunner,

---

[6] The evidence at trial established that during this time, Defendant-Purchaser was seeking financing from Sterling National Bank. *See* 8/17 Trial Tr. 32:9–14. Significantly, Sterling National Bank was not ready to close by as late as July 28. *See* 8/17 Trial Tr. 63:13–25.

[7] Although Mr. Brunner testified at trial that Defendant-Purchaser was not contemplating an assignment of the Agreement in the April/May timeframe, documentary evidence makes clear that Defendant Purchaser was in fact in discussions with counsel to a potential assignee by this time. *See* TX 2; *see also* TX 8. Indeed, Defendant-Purchaser conceded that it was negotiating with the potential assignee beginning in February 2015. *See* TX 2; *see also* Defendant's Pre-Trial Brief [ECF No. 23] at 6; Def. Post-Tr. Br. at 5.

was direct and unequivocal in, for example, stating that Defendant-Purchaser was ready to close, on cross-examination, Mr. Brunner became evasive and at times combative. The Court finds that neither Party was ready to close in May 2015 and the adjournment to a later date was consensual.

The closing date was tentatively rescheduled for June 30, 2015. *See* 8/17 Trial Tr. 33:22–24; *see also* 8/16 Trial Tr. 59:12–17. However, as the new closing date approached, Plaintiff-Seller could not receive a firm confirmation from the Defendant's lawyer that the closing would proceed as scheduled. *See* 8/16 Trial Tr. 62:14–19. Plaintiff-Seller established at trial that, then unbeknownst to the Seller [*see* 8/16 Trial Tr. 72:9–13], by this time, the Defendant-Purchaser was pursuing the possibility of "flipping the transaction," and had a "90 percent chance" of assigning the Agreement to a third-party. *See* 8/17 Trial Tr. 33:22–34:4. The evidence adduced at trial collectively makes clear that events surrounding Defendant-Purchaser's potential assignment of the Agreement in the period leading up to the closing scheduled for June 30 ultimately were responsible for souring the deal.

Defendant-Purchaser's principal, Mr. Brunner, testified that in the time leading up to the rescheduled closing, he was engaged in negotiations with a real estate investor named Kevin Lalezarian [*see* 8/16 Trial Tr. 154:1] to assign, or "flip," the Agreement. *See* 8/17 Trial Tr. 51:23–52:3. While the Defendant-Purchaser was permitted to assign the Agreement, paragraph 23 clearly significantly limited the Defendant's right to assign the contract only to entities owned or controlled by the Defendant-Purchaser. TX 1, ¶23. The evidence at trial left little doubt that Purchaser's Brunner deliberately concealed his negotiations with Mr. Lalezarian from the Plaintiff-Seller. *See* 8/17 Trial Tr. 51:23–52:15; *see also* 8/17 Trial Tr. 155:4–156:17; TX 24; TX 26.

Mr. Lalezarian was called by the Plaintiff-Seller to testify at trial and the Court found him to be an objective and credible witness. He testified that he first became aware of the Property after a businessman named Jeffery Kahen, with whom Mr. Lalezarian previously had purchased property, was approached by Sam Rottenberg, a real estate broker working with the Defendant-Purchaser. *See* 8/16 Trial Tr. 154:5–25; 8/17 Trial Tr. 29:19. After Mr. Kahen brought the deal to Mr. Lalezarian's attention, they both began negotiating with Mr. Rottenberg. *See* 8/16 Trial Tr. 154:17–25. Mr. Lalezarian was made aware that Rottenberg represented a group that was in contract to purchase the Property. *See* 8/16 Trial Tr. 155:3–8. Mr. Lalezarian understood that the deal would be structured such that the Defendant-Purchaser would assign the Agreement to purchase the Property to Brooklyn Myrtle LLC, an entity formed by Messrs. Lalezarian and Kahen for the purposes for acquiring and developing the Property. *See* 8/16 Trial Tr. 155:21–156:5.

Mr. Lalezarian testified that at one point during the negotiations, the parties to the "flip transaction" agreed on a price of $21.5 million, one million dollars more than the underlying purchase price under the Agreement with the Plaintiff-Seller. *See* 8/16 Trial Tr. 165:13–20. But, as the negotiations continued, the parties failed to finalize an agreement [*see* 8/16 Trial Tr. 163:12–15] because, *inter alia*, the Defendant-Purchaser apparently wanted a higher price for the flip. *See* 8/16 Trial Tr. 157:2–21; 163:19–24; 170:19–171:7. Ira Nesenoff, an attorney who represented Mr. Lalezarian with respect to negotiation of the assignment and purchase agreements [*see* 8/16 Trial Tr. 156:16–20], was also called by the Plaintiff-Seller as a trial witness. Mr. Nesenoff testified that while the original offer was for $23.5 million, three million more than the underlying purchase price, his client (Lalezarian ) "was always holding fast at" $21.5 million. *See* 8/16 Trial Tr. 199:14–16; *see also* 8/16 Trial Tr. 202:4–10, 21–23; TX 3. Mr.

Brunner, on the other hand, testified that he had negotiated an assignment of the Agreement with

Mr. Kahen for $23.5 million [*see* 8/17 Trial Tr. 30:4–22] and it was the other side that kept "re-

trading" Mr. Brunner on the price. *See* 8/17 Trial Tr. 34:5–35:3. In any event, the parities to the

flip made clear that they never came to an agreement on a price for the flip transaction, and

ultimately, by July 2015, the negotiations broke down. Based on the testimony at trial, the Court

finds that there was never a meeting of the minds between Messrs. Lalezarian and Brunner with

respect to the purchase price for the assignment of the Agreement. *See* 8/16 Trial Tr. 173:2–7;

174:5–8.

Other aspects of these negotiations on the contemplated "flip" transaction inform the

Court's finding regarding Defendant-Purchaser's unwillingness and inability to close on the sale.

As noted, the Agreement expressly limited the Purchaser's ability to assign the Agreement to

entities owned or controlled by principals of the Purchaser-Defendant, *i.e.* Messrs. Abraham

Mandel and Ira/Shifra Hager. *See* TX 1, ¶ 23. Purchaser's Mr. Brunner testified that any

agreement on the flip transaction drafted by the attorneys for Mr. Lalezarian (Ira Nesenoff, Esq.)

and Defendant-Purchaser (Jeffry Zwick, Esq.) [*see* 8/17 Trial Tr. 92:16–20], would conform to

paragraph 23 of the Agreement. *See* 8/17 Trial Tr. at 53:19–54:1. However, no basis was given

for this supposed understanding and the Court finds this testimony simply not credible in light of

the unequivocal testimony of Mr. Lalezarian that he did not intend for Mr. Hager or Mr. Mandel

to be partners with Brooklyn Myrtle LLC in the acquisition of the Property. *See* 8/16 Trial Tr.

156:3–11.

Importantly, Mr. Lalezarian testified that he became aware of the limitations on

assignment in the Agreement during his negotiations with the Defendant [*see* 8/16 Trial Tr.

162:1–12], and once aware of the paragraph 23 limitations on assignment, Mr. Lalezarian

"explicitly required a consent of the owner of the [P]roperty." 8/16 Trial Tr. 162:10–12. The

Court finds credible Mr. Lalezarian's testimony that he would not proceed without obtaining the

Plaintiff-Seller's consent. *See* 8/16 Trial Tr. 162:16–18; *see also* 171:16–22. Indeed, at some

point, Mr. Lalezarian met directly with the Plaintiff-Seller's principal and discussed whether

Plaintiff-Seller would consent to an assignment of the Agreement. *See* 8/16 Trial Tr. 165:3–12.

Plaintiff-Seller conveyed that in order to provide its consent to an assignment, it would need to

be paid a portion of the amount Brooklyn Myrtle LLC was paying the Defendant-Purchaser for

the assignment. *See* 8/16 Trial Tr. 165:21–23. At one point, the parties discussed a fee of

$350,000 for the Plaintiff-Seller's consent to the assignment [*see* 8/16 Trial Tr. 141:18–145:24;

165:21–166:2; *see also* TX 43; TX 63], but there was never an agreement reached to obtain the

Plaintiff-Seller's consent to an assignment.

The evidence is clear that shortly before the closing date, issues arose with respect to the

location for the closing [*see* TX 24], which the Court finds were driven wholly by the

contemplated assignment. One day before the scheduled closing, on the evening of June 29,

2015, in an email to Seller's Mr. Ambalu, Purchaser's attorney, Mr. Zwick, suddenly insisted

that the closing take place at the office of Ira Nesenoff, Esq.[8]  *See* TX 24; *see also* 8/16 Trial Tr.

63:25–64:18. Although Nesenoff represented the potential assignee, Mr. Lalezarian, in the

assignment deal, at this time Defendant-Purchaser led Plaintiff-Seller to believe that Nesenoff

was counsel to the Defendant-Purchaser's lender. *See* 8/16 Trial Tr. 46:4–7. Thus, Mr. Ambalu

testified that he "was advised [that Mr. Nesenoff] represent[ed] the purchaser's lender, the lender

---

[8] In an earlier email exchange with Purchaser's counsel Zwick that took place before the originally scheduled April closing date, Mr. Nesenoff had conveyed his preference for the closing to take place at either his office or the office of Jeffery Kahen (potential co-assignee with Lalezarian [*see* 8/16 Trial Tr. 156:3–5]), to which Purchaser's counsel Zwick responded by indicating his preference to close at attorney Nesenoff's office. *See* TX 8; *see also* 8/17 Trial Tr. 115:20–116:2. There is no evidence that this preference was shared with Plaintiff-Seller until the evening before the June 30 closing.

that is giving the mortgage to [the] purchaser to purchase this property" [8/16 Trial Tr. 46:4–7], and that the Defendant-Purchaser represented "[a]ll along . . . no ambiguity about it" [8/16 Trial Tr. 64:4–9], that Mr. Nesenoff was counsel to the purchaser's lender.  In connection with the June 30 closing, Mr. Nesenoff also suggested that he and his client "stay in [his] office and not in the closing room," apparently to keep the existence of the assignment from the Plaintiff-Seller. TX 8. Indeed, Mr. Zwick candidly testified that the reason "[t]o keep the parities in separate rooms [is] so neither party is privy to what is going on in the other room." *See* 8/17 Trial Tr. 117:2–9. In emails to the Defendant-Purchaser's attorney, Mr. Nesenoff pointedly asked whether the Seller was aware of his and his clients' role in the deal, and Mr. Zwick responded, "[h]e thinks you are lender['s] counsel." *See* TX 8.[9] Based on the testimony at trial and the documentary evidence, it is clear that Defendant-Purchaser did not notify the Plaintiff-Seller of the potential assignment and indeed Defendant-Purchaser intentionally attempted to conceal the assignment from the Plaintiff-Seller. *See* 8/17 Trial Tr. 117:16–21.

Despite Purchaser's efforts to hide its attempt to flip the Agreement, during the time leading up to the adjourned June 30 closing date, Seller's Mr. Ambalu "had a hunch" that the Defendant-Purchaser "was trying to keep something from" the Plaintiff-Seller [8/16 Trial Tr. 65:13–16], and in particular, suspected a potential unauthorized assignment of the Agreement. *See id.* at 65:13–66:2. Seller's Ambalu testified that, in his mind, if the closing took place at their offices, Seller could control the deal in order to ensure nothing was "going on behind closed doors." *See* 8/16 Trial Tr. 65:19–66:2. Therefore, the Plaintiff-Seller initially refused to relocate the closing when Defendant-Purchaser made its demand to do so the evening before the closing.

---

[9] Mr. Nesenoff also represented MMM Lender LLC, an entity set up by Mr. Lalezarian's father to fund a portion of the flip deal. *See* 8/16 Trial Tr. 162:19–163:7; *see also* 8/16 Trial Tr. 189:18–190:4.

*See* TX 24; *see also* 8/16 Trial Tr. 63:10–65:10. And, when Mr. Zwick alerted Mr. Nesenoff about his difficulty in changing the closing location to Mr. Nesenoff's office, Mr. Nesenoff asked, "[w]e are the purchaser's lender [w]hy is that unusual?" Mr. Zwick responded: "I guess they know the circumstances surrounding the 'loan.'" *See* TX 10.

When asked whether he "deliberately failed to advise the [S]eller [of the potential assignment to Mr. Lalezarian] because [he] didn't want [the Seller] to know about the assignment of the contract," Mr. Brunner testified that he "had no obligation under the contract[] to notify the seller of any assignments."[10] 8/17 Trial Tr. 52:7–11. He acknowledged that he made a deliberate decision not to notify the Plaintiff-Seller of any assignment. *See* 8/17 Trial Tr. 52:7–15. Mr. Brunner further testified that he preferred that the Plaintiff-Seller and Mr. Lalezarian did not know about each other. *See* 8/17 Trial Tr. 58:6–11. Nonetheless, Mr. Brunner adamantly insisted—somewhat incredibly—that there was no deception on his part with respect to Mr. Nesenoff and Mr. Lalezarian's role in the transaction. *See* 8/17 Trial Tr. 58:18–25. The Court finds that the evidence collectively clearly demonstrates there was a concerted effort on the part of the Purchaser to conceal from the Plaintiff-Seller the proposed assignment of the Agreement to Mr. Lalezarian, which assignment was not in compliance with paragraph 23 of the Agreement.

Despite his suspicion, Mr. Ambalu ultimately agreed to have the closing at Mr. Nesenoff's office [*see* 8/16 Trial Tr. 66:3–19], and on the morning of June 30, emailed Mr. Zwick advising him that the Plaintiff was prepared to close at Mr. Nesenoff's office later that day. *See* TX 27; *see also* 8/16 Trial Tr. 66:3–16. Notwithstanding the Seller's agreement, the closing never took place. *See* 8/16 Trial Tr. 71:12–13; TX 42. It is clear from the evidence at trial that the potential flip deal disrupted the anticipated June 30 closing.

---

[10] Similarly Purchaser's counsel Mr. Zwick testified at his deposition that "I don't think I was obligated to be forthright with the [S]eller as to Mr. Nesenoff's position in this transaction." 8/17 Trial Tr. 155:4–156:17.

The evidence establishes that Plaintiff-Seller was taking steps to proceed with the June 30 closing, but Defendant Purchaser did not cooperate. In response to Mr. Ambalu's email asking for information to prepare the deed and closing documents, at the eleventh hour on the morning of the closing, Mr. Zwick provided the name of a new entity that was to be listed as purchaser on the deed. *See* TX 27; *see also* 8/16 Trial Tr. 68:6–7. Seller's Mr. Ambalu testified that he understood that the principals who created the entity were "Abraham Mandel or Isaac/Shifra Hager," [*see* 8/16 Trial Tr. 68:7–12] in accordance with the assignment provision of the Agreement. *See* TX 1, ¶ 23. He further testified that he was not advised that the entity was created by Mr. Lalezarian. *See* 8/16 Trial Tr. 68:17–24. Mr. Ambalu testified that there was a further issue in that he had not received an updated title report from Reliable Abstract, the entity Mr. Ambalu understood was the title company for the closing. *See* 8/16 Trial Tr. 69:14–21. In an attempt to seek clarification, Mr. Ambalu emailed Mr. Zwick, stating that he had called Reliable Abstract and was told that Mr. Zwick asked the title company to "hold off." *See* TX 42; *see also* 8/16 Trial Tr. 70:3–13. Mr. Zwick responded that a different title company would be reaching out shortly; however none ever did. *See* TX 42; *see also* 8/16 Trial Tr. 70:17–20. Mr. Ambalu then asked Mr. Zwick to, among other things, provide the name of the new title company, and Mr. Zwick ultimately responded that it was unlikely the closing would be going forward on June 30. *See* TX 42; *see also* 8/16 Trial Tr. 70:20–71:9. The Parties did not close on June 30. *See* 8/16 Trial Tr. 71:12–13.

On July 2, 2015, Mr. Ambalu emailed Mr. Zwick to arrange a new proposed closing date. *See* TX 42. Having received no response, the Parties were unable to consensually reschedule a closing. *See* TX 42; *see also* Plaintiff's Post-Trial Brief [ECF No. 37] at 13. Now armed with the

knowledge of an unauthorized assignment,[11] in order to set a firm closing date [*see* 8/16 Trial Tr.

73:23–25], Mr. Ambalu sent a letter to Mr. Zwick on July 14, 2015 (the "TOE Letter") calling

for a time is of the essence closing under the Agreement on July 28, 2015 (the "Law Day"). *See*

TX 43. Specifically, the pertinent paragraph of the TOE Letter states:

> Seller will tolerate no further delay. Accordingly, Seller hereby declares a closing date
> under the contract for **Tuesday, July 28, 2015 at 11:00a.m.** in my offices . . . . **TIME
> BEING OF THE ESSENCE** as to Purchaser's obligations. At that time, Seller shall
> tender title to Purchaser in accordance with the Contract. If Purchaser fails to appear at
> the time and place and fails to tender performance under the Contract, Purchaser shall be
> in material default of the Contract entitling Seller to enforce its rights and remedies
> thereunder, including, without limitation, terminating the Contract and retaining the
> Purchaser's Deposit as liquidated damages.

TX 43 (emphasis in original). In addition to declaring that time was of the essence and setting a

closing for July 28, 2015, the letter offered the Defendant-Purchaser a way to proceed with an

unauthorized assignment. The TOE Letter stated that "[t]he price for consent to the assignment is

$350,000 [and] anything short of that and there will be no assignment." *Id.* at 2.

The Defendant admitted at trial, and there can be no dispute that the Defendant and its

counsel, Mr. Zwick, received the TOE Letter on July 15, 2015 [*see* 8/17 Trial Tr. 35:12–20; *see

also* 8/17 Trial Tr. 131:16–25], thirteen days before the Law Day. *See* TX 67. In response to the

TOE Letter, on July 17, 2015, the Defendant-Purchaser sent a letter rejecting the demand and

requesting an adjournment. *See* TX T. On July 27, 2015, the Defendant-Purchaser sent a second

letter, notifying the Plaintiff it was "exercise[ing] its right pursuant to Section 8 of the Contract

to adjourn the closing until August 27, 2015 . . . ." TX C.

It is undisputed that on "Law Day" (July 28, 2015), the parties met, as provided for in the

TOE Letter, at the law offices of Goldberg Weprin Finkel Goldstein LLP, counsel to Plaintiff-

---

[11] It was sometime after the failed June 30 closing date that the Plaintiff-Seller confirmed its earlier suspicion and
became fully aware of the proposed assignment to Mr. Lalezarian. *See* 8/16 Trial Tr. 72:9–17.

Seller, to conduct the closing. *See* TX 47 (transcript of closing ceremony). Shortly before the

start of the closing, on the morning of July 28, 2015, the Defendant had filed an action in New

York state court,[12] placing an *ex parte* notice of pendency on the property. *See* TX 47 at 11:5–9;

8/16 Trial Tr. 93:1–4. The closing ceremony commenced as scheduled without the Plaintiff

being aware of the just-filed state court action or the *lis pendens*. *See* TX 47 at 11:14–24. At the

closing, the Defendant's counsel took the position that the TOE Letter was defective and brought

up a number of purported deficiencies with the Plaintiff's tender. *See* TX 47; *see also*

Defendant's Post Trial-Brief [ECF No. 36] at 10–11. Despite these objections, the title company

cleared title at the closing. *See* TX 47 at 29:19–20. However, the Defendant did not tender funds

to close on the purchase.

Purchaser's Mr. Brunner testified that he brought his tablet PC to the closing, and during

the closing, logged onto his bank's website and showed the Plaintiff-Seller that he had sufficient

funds in a number of accounts to close. *See* 8/17 Trial Tr. 37:21–24. It is undisputed that none of

the accounts were in the Defendant's name [*see* 8/17 Trial Tr. 73:21–74:6], and that, in fact, Mr.

Brunner never opened a bank account in the name of the Defendant-Purchaser. *See* 8/17 Trial Tr.

17:14–17. Mr. Brunner testified that, at the closing, the Plaintiff gave him two options—either

pay an additional $350,000 for consent to the assignment or accept the return of the $7.5 million

Deposit. *See* 8/17 Trial Tr. 36:24–37:2; 207:7–15.

The parties never consummated the Agreement. *See* Joint Pretrial Order at 1–2. Plaintiff-

Seller contends that, before the closing ceremony ended, it declared the Defendant-Purchaser in

default. *See* Plaintiff's Post-Tr. Br. at 15.

---

[12] Index No. 509230/2015. Counsel to Defendant-Purchaser testified that there was concern that the Plaintiff-Seller was negotiating to sell the Property to another purchaser for a higher price. *See* 8/17 Trial Tr. 142:11–23; *see also* TX 50.

<u>This Adversary Proceeding</u>

Shortly after the failed closing ceremony, on September 1, 2015, the Plaintiff filed a voluntary chapter 11 petition with this Court. As a result, pursuant to section 362 of the Bankruptcy Code, the state court action commenced by the Defendant-Purchaser was stayed. On September 25, 2015, the Plaintiff commenced this adversary proceeding. In its complaint, the Plaintiff seeks a judgment declaring the Defendant in default under the Agreement and awarding the $7.5 million contract Deposit as liquidated damages pursuant to the terms of the Agreement.[13]

On November 20, 2015, Defendant filed its answer and counterclaims against the Plaintiff [ECF No. 5]. The Defendant denies the material allegations in the Complaint and maintains it was ready, willing, and able to close on July 28, 2015. The Defendant's counter-claims seek specific performance and money damages of no less than $35,500,000 plus interest, purportedly arising from the Plaintiff's alleged breach of the Agreement and other misconduct. The Defendant also asserts counterclaims for breach of implied covenant of good faith and fair dealing and unjust enrichment.

## **DISCUSSION**

Under New York Law, "[t]o establish a *prima facie* case for breach of contract, a plaintiff must plead and prove: (1) the existence of a contract; (2) a breach of that contract; and (3)

---

[13] Paragraph 15 of the Agreement provides:

> Purchaser and Seller agree that it would be impractical or extremely difficult to fix actual damages in the event of a Default by Purchaser and the amount of the Deposit hereunder is the parties reasonable estimate of Seller's damages in the event of Purchaser's material default and that upon Purchaser's default in its material obligations under this agreement not caused by any breach of Seller, Seller shall retain the Deposit as liquidated damages, which shall be Seller's sole and exclusive remedy at law or at equity for Purchaser's default.

TX 1, ¶ 15.

damages resulting from the breach." *Nat'l Mkt. Share, Inc. v. Sterling Nat. Bank*, 392 F.3d 520, 525 (2d Cir. 2004) (internal citations omitted). With respect to a contract for a sale of real property, "where a seller seeks to hold a purchaser in breach of contract, the seller must establish that it was ready, willing, and able to perform on the time-of-the-essence closing date, and that the purchaser failed to demonstrate a lawful excuse for its failure to close." *Donerail Corp. N.V. v. 405 Park LLC*, 100 A.D.3d 131, 138, 952 N.Y.S.2d 137, 142 (1st Dep't 2012). Here, there is no dispute that the Agreement existed. Thus, the dispositive issues are whether the time is of the essence notice was reasonable, and if so, whether the Plaintiff-Seller was ready, willing, and able to close on Law Day, and whether the Defendant-Purchaser was ready, willing, and able to close on Law Day or failed to demonstrate a lawful excuse for its failure to close.

### A. Declaration by the Plaintiff-Seller of a Time is of the Essence Closing Was Reasonable

Ordinarily, under New York law,[14] time is not deemed of the essence in a contract for the sale of real property unless there is a clear provision making time of the essence in the contract, "or it necessarily follows from the nature and circumstances of the contract." *Duffy v. O'Donovan*, 46 N.Y. 223, 227 (1871); *see also N. Triphammer Dev. Corp. v. Ithaca Assocs.*, 704 F. Supp. 422, 429 (S.D.N.Y. 1989) ("As a general proposition, time is not of the essence of a contract of purchase and sale of realty in the absence of a clear provision making it so." (citation omitted)); *ADC Orange, Inc. v. Coyote Acres, Inc.*, 7 N.Y.3d 484, 489, 857 N.E.2d 513, 516 (2006). Even where a specific closing date is included in a contract for the sale of real property, time is not automatically deemed of the essence. *See Ring 57 Corp. v. Litt*, 28 A.D.2d 548, 548–49, 280 N.Y.S.2d 330, 332 (2d Dep't 1967) (finding "time was not of the essence in this contract

---

[14] Paragraph 24(g) of the Agreement provides that the "Agreement shall be construed and enforced in accordance with the laws of the State of New York." Both sides have briefed the legal issues under New York law.

[and t]he mere designation of a date upon which a thing is to be performed does not alone bring about any such result." (citation omitted)).

Where time is not of the essence, "the law permits the respective parties a reasonable time in which to tender performance, regardless of whether the contract specifies a particular date on which such performance is to be tendered." *Mader v. Mader*, 101 A.D.2d 881, 882, 476 N.Y.S.2d 195, 197 (2d Dep't 1984); *see also Citizens Bank & Trust Co. v. Se-Fish Assocs.*, 2003 WL 22383564, at *4 (W.D.N.Y. Sept. 30, 2003) (citing *Savasta v. 470 Newport Assoc.,* 82 N.Y.2d 763, 765, 603 N.Y.S.2d 821, 623 N.E.2d 1171 (1993); *Tupper v. Wade Lupe Const. Co.,* 39 Misc. 2d 1053, 242 N.Y.S.2d 546, 549 (N.Y. Sup. Ct. 1963)). On the other hand, where time is of the essence with respect to a real estate contract, "each party must tender performance on law day," the date specified, "unless the time for performance is extended by mutual agreement." *Grace v. Nappa*, 46 N.Y.2d 560, 565, 389 N.E.2d 107, 109 (1979) (citations omitted). If time is of the essence, failure to close on the designated law day by either party is a default of the agreement. *See id.*; *see also Sherman v. Real Source Charities, Inc.*, 41 A.D.3d 946, 947, 837 N.Y.S.2d 432, 433 (3d Dep't 2007).

It is well settled that when the original agreement does not make time of the essence, one party unilaterally may subsequently make time of the essence. *See Taylor v. Goelet*, 208 N.Y. 253, 258, 101 N.E. 867, 868 (1913); *see also Madison Park Owner LLC v. Schneiderman*, 93 A.D.3d 555, 556, 940 N.Y.S.2d 605, 606 (1st Dep't 2012); *Decatur (2004) Realty, LLC v. Cruz*, 73 A.D.3d 970, 971, 901 N.Y.S.2d 368, 369 (2d Dep't 2010) (citing *Cave v. Kollar,* 296 A.D.2d 370, 371, 744 N.Y.S.2d 497 (2d Dep't 2002); *Savitsky v. Sukenik,* 240 A.D.2d 557, 558, 659 N.Y.S.2d 48 (2d Dep't 1997)); *Liba Estates, Inc. v. Edryn Corp.*, 178 A.D.2d 152, 153, 577 N.Y.S.2d 19, 20 (1st Dep't 1991). "[E]ither party can make time of the essence by giving clear

and unequivocal notice that the contract must be performed within a certain reasonable time." *N.*

*Triphammer Dev. Corp. v. Ithaca Assocs.*, 704 F. Supp. 422, 429 (S.D.N.Y. 1989) (internal

citations omitted). When determining the validity of a party's notice to convert an agreement into

one in which time is off the essence, courts generally scrutinize the notice for three criteria to

ensure that the communication:

> (1) "g[a]ve clear, distinct, and unequivocal notice that time is of the essence;"
>
> (2) "g[a]ve the other party a reasonable time in which to act;" and
>
> (3) "inform[ed] the other party that if he does not perform by the designated date, he will be considered in default."

*Nehmadi v. Davis*, 63 A.D.3d 1125, 1127, 882 N.Y.S.2d 250, 252 (2d Dep't 2009) (citing *Moray*

*v. DBAG, Inc.,* 305 A.D.2d 472, 760 N.Y.S.2d 193 (2d Dep't 2003)). The Court concludes that

each of these criteria are satisfied in the TOE Letter at issue here. *See* TX 43.

### *(1)   The Notice Was Clear, Distinct, and Unequivocal that Time was of the Essence*

First, and as stated above, "[t]he law requires clear, distinct and unequivocal notice for

time to be made of the essence." *N. Triphammer Dev. Corp. v. Ithaca Associates*, 704 F. Supp.

422, 429 (S.D.N.Y. 1989) (internal quotation omitted). The Defendant argues that the TOE

Letter here was not clear, distinct, and unequivocal as required in order to be effective under

New York law. *See Defendant's Post Trial-Brief* [ECF No. 36] at 16. The Defendant asserts that

the "TOE Letter is long, vague, and ambiguous," and sought unilaterally to change the terms of

the Agreement by requiring the Defendant to pay $350,000 for the Plaintiff's consent to the

assignment. *See id.* The Plaintiff, on the other hand, maintains that the TOE Letter was clear,

distinct, and unequivocal. *See* Plaintiff's Post-Tr. Br. at 18.

The TOE Letter is a two page document, hardly "long" or "rambling" as Defendant

contends. *See* Def. Pre-Trial Br. at 9. The very first paragraph alerts the Purchaser that one of the

two purposes of the letter is to declare that time is of the essence and the notice is clearly set forth on the second page. *See* TX 43. In bold face, the letter specifies the declared closing date and goes on in bold uppercase type to recite that time is of the essence. *See id.* In the same pertinent paragraph, the letter clearly and unequivocally advises Purchaser that failure to appear and tender performance under the Agreement shall be a material breach entitling seller to, *inter alia*, liquidated damages. *See* TX 1, ¶ 15.

In contending that the TOE Letter is not clear and unequivocal, the Defendant-Purchaser further argues that "the Purported TOE Letter unnecessarily obfuscated the parties' rights under the Contract [b]y requiring Purchaser to appear at the July 28th Closing and pay the Debtor a $350,000 price increase if Purchaser intended to exercise its right to assign the Contract . . . ." Joint Pretrial Order at 14. The Court does not agree with the Defendant-Purchaser's characterization of the letter. The time is of the essence language is clear and calls for performance "*under the contract*," *i.e.* the Agreement (TX 1). The second stated purpose of the letter is to address Purchaser's attempted assignment. While the Defendant is correct that paragraph 23 of the Agreement "permitted an assignment by its terms" [Def. Post-Tr. Br. at 16], the Defendant conveniently ignores the clear restrictions placed on assignment in the Agreement. The Agreement makes clear that the only permissible assignee is "a newly formed . . . entity formed to take title to the Property, owned or controlled by Abraham Mandel or Isaac/Shifra Hager." *See* TX 1, ¶ 23. There is no evidence that Mr. Mandel or the Hagers were owners or had a controlling share in the potential assignee, and indeed the evidence is to the contrary. In fact, as noted above, Kevin Lalezarian, the proposed assignee, testified unambiguously that he had no intention to involve Mr. Mandel or the Hagers in Brooklyn Myrtle LLC. *See* 8/16 Trial Tr. 156:6–11. As such, any assignment to Mr. Lalezarian was not permissible.

The TOE Letter was sent both to declare time of the essence and to address this issue.[15] In the TOE Letter, in addition to providing the time of the essence notice, the Seller offered the Purchaser a way forward with its contemplated assignment notwithstanding that it was not authorized under the Agreement. Thus, the fourth paragraph of the TOE Letter clearly states that "[t]he price for a consent to the assignment is $350,000. Anything short of that and *there will be no assignment*." TX 43 (emphasis added); *see also* 8/16 Trial Tr. 74:20–25; 8/16 Trial Tr. 92:5–20. Significantly, the letter does not say that anything short of the $350,000 fee for consent to an assignment and there will be no closing. Rather, the fifth paragraph of the TOE Letter, in which the Plaintiff-Seller declared time of the essence, clearly states that on Law Day, "Seller shall tender title to the Premises *in accordance with the Contract*." TX 43 (emphasis added). The plain language of the fifth paragraph states that the Plaintiff-Seller would be prepared to close *in accordance with the Agreement*, which does not include the proposed assignment to Mr. Lalezarian or the $350,000 fee for consent.

As such, the Court concludes that, contrary to the Defendant's contention, the TOE Letter is clear, distinct, and unequivocal, and plainly calls for tender of performance by both sides "under the Contract." The $350,000 fee was not a unilateral change to the terms of the Agreement. Instead, the TOE Letter also offered Defendant-Purchaser a way to proceed with an unauthorized assignment in exchange for a fee for the Plaintiff's consent to an assignment that did not satisfy the limitations previously agreed to by the Parties as set forth in paragraph 23. Given the history of difficulties with bringing the deal to a close, the attempt by Defendant-

---

[15] Plaintiff-Seller clearly sets forth its intent in the first paragraph: "I write for two reasons, each of which shall be addressed below: First, your effort to renege upon the agreement pursuant to which Seller was willing to permit an assignment of the contract; and, second, to provide you with notice of a time of the essence closing date which Seller is hereby declaring." TX 43.

Purchaser to conceal the assignment in the first instance, and the apparent desire of Defendant-

Purchaser to assign the Agreement in order to close, it was reasonable for Plaintiff-Seller to

include the option of a fee for consent in the letter. The inclusion of the fee in the TOE Letter

does not defeat the fact that it was unequivocal notice under New York law that time was of the

essence.

### (2) *The Notice Period was Reasonable*

A unilateral notice that time is of the essence must give the other party a reasonable time

to close. *See Ballen v. Potter*, 251 N.Y. 224, 229, 167 N.E. 424, 425 (1929) (citations omitted). It

has long been held that "[w]hat constitutes a reasonable time for performance depends upon the

facts and circumstances of the particular case." *Zev v. Merman*, 73 N.Y.2d 781, 783 (1988)

(citing *Ballen v. Potter,* 251 N.Y. 224 (1929); *Murray Co. v. Lidgerwood Mfg. Co.,* 241 N.Y.

455, 459 (1926)); *see also N. Triphammer Dev. Corp. v. Ithaca Assocs.*, 704 F. Supp. 422, 430

(S.D.N.Y. 1989). Therefore, whether notice was reasonable is determined on a case-by-case

basis.[16] *See Zev v. Merman*, 73 N.Y.2d at 783 ("The determination of reasonableness must by its

very nature be determined on a case-by-case basis."). When determining reasonableness, courts

consider "the nature and object of the contract, the previous conduct of the parties, the presence

or absence of good faith, the experience of the parties and the possibility of prejudice or hardship

to either one, as well as the specific number of days provided for performance." *Id.* (internal

citations omitted).

Plaintiff-Seller argues that the notice period was reasonable. The Plaintiff cites to the

previously scheduled closings and delay occasioned by Defendant-Purchaser's efforts to conceal

---

[16] Indeed, "[s]ince there are no bright-line criteria establishing the reasonableness of a particular time period, and insofar as the nuances of each case are different, relevant precedents [and] outcomes are not necessarily dispositive." *Miller v. Almquist*, 241 A.D.2d 181, 186–87, 671 N.Y.S.2d 746, 750 (1st Dep't 1998).

a planned assignment from the Seller to support its position that thirteen days' notice was

reasonable. *See* Pl. Post-Tr. Br. at 19–20. Additionally, the Plaintiff relies on the Defendant's

claim that it was ready, willing, and able to close in June, arguing Defendant therefore should

have been ready to close in July. The Plaintiff also alleges bad faith, claiming that the Defendant

"stalled the closing on multiple occasions so as to perpetuate the charade relating to the

Lalezarian assignment . . . ." *Id.* at 20.

The Court concludes that, under the circumstances, the thirteen day notice was

reasonable. As an initial matter, numerous cases have found reasonable notice periods shorter

than the notice given here. *See, e.g.*, *Spodek v. Feibusch*, 246 A.D.2d 528, 528, 666 N.Y.S.2d

946 (2d Dep't 1998) (finding 13 days reasonable); *James v. James*, 205 A.D.2d 735, 736, 614

N.Y.S.2d 907 (2d Dep't  1994) (same); *Zev v. Merman*, 134 A.D.2d 555, 558, 521 N.Y.S.2d 455,

458 (1987), *aff'd,* 73 N.Y.2d 781, 533 N.E.2d 669 (2d Dep't 1988) (finding eight days

reasonable); *Tom Jones Realty Corp. v. Frick*, 144 A.D.2d 451, 533 N.Y.S.2d 995, 996 (2d Dep't

1988) (finding eight days reasonable where only one closing obligation was remaining); *Shannon

v. Simon*, 128 A.D.2d 859, 859, 513 N.Y.S.2d 778, 779 (2d Dep't 1987) (finding 12 days

reasonable); *cf. 3M Holding Corp. v. Wagner*, 166 A.D.2d 580, 581, 560 N.Y.S.2d 865, 867 (2d

Dep't 1990) (same); *Nissenbaum v. Ferazzoli*, 143 A.D.2d 823, 533 N.Y.S.2d 140, 141 (2d

Dep't  1988) (finding five days unreasonable); *Mazzaferro v. Kings Park Butcher Shop, Inc.*, 121

A.D.2d 434, 435, 503 N.Y.S.2d 134, 135 (2d Dep't 1986) (finding seven days unreasonable).

The facts and circumstances of this case support the conclusion that thirteen days' notice

was reasonable. This is especially true given the sophisticated nature of the Parties and their

extensive experience with real estate transactions. In light of the Defendant-Purchaser's

unresponsiveness with respect to scheduling the June 30 closing and follow-up attempts to

reschedule a firm closing date, and the Defendant's attempt to conceal the assignment of the

Agreement, which justifiably led to concerns regarding the Defendant-Purchaser's ability to

close, the Court concludes that the notice here was reasonable and appropriate. Finally, in light

of the testimony of Defendant-Purchaser's Mr. Brunner that the Defendant-Purchaser was ready

to close without an assignment in April and May [*see* 8/17 Trial Tr. 32:9–14], it follows that

steps necessary to close certainly should have been underway prior to July 28 given the

previously repeated scheduled closings in this case. It is counter-intuitive for the Defendant to

maintain it was prepared to close months before the July 28th Law Day, assert that it was ready,

willing, and able to close on Law Day, appear at the closing, and now argue that the notice was

unreasonable.[17]

(3)  *The TOE Letter Informed the Defendant-Purchaser That It Would*
     *Be In Default If It Failed To Perform On Law Day*

The Defendant-Purchaser argues that the "TOE Letter is a long, rambling missive," and is

not clear, distinct, and unequivocal notice that failure to perform on Law Day would amount to a

default of the Agreement. *See* Def. Pretrial Br. at 9. The Court finds that the TOE Letter clearly

informed the Defendant-Purchaser that if it did not perform on Law Day, it would be in default.

The two-page TOE Letter recited plainly and concisely:

> If purchaser fails to appear at that time and place and fails to tender its performance under
> the Contract, Purchaser shall be in material default of the Contract entitling Seller to

---

[17] Defendant's argument that the Plaintiff was not acting in good faith by refusing to grant an adjournment of the July 28 Law Day, and declared that time was of the essence "in order to ensure that the transaction would not close, so that the [Plaintiff] could sell the Property at a higher price" [Def. Post-Tr. Br. at 15–16] is unavailing. Under New York law, where time is of the essence, each party to a real estate contract must tender performance on law day unless time for performance is extended by mutual agreement. *See Grace v. Nappa*, 46 N.Y.2d 560, 565, 389 N.E.2d 107, 109 (1979) (citations omitted); *see also Parker Hannifin Corp. v. N. Sound Properties*, No. 10 CV 6359 MHD, 2013 WL 1932109, at *6 (S.D.N.Y. May 8, 2013). Moreover, the Agreement itself specified that adjournments (a right of both Purchaser and Seller) were "not to exceed 30 days in the aggregate." TX 1, ¶ 8. It is undisputed that there was no agreement to further extend the time for performance. The Court finds that Defendant-Purchaser's argument regarding Plaintiff-Seller's purported motivation in refusing to further adjourn the closing is unpersuasive and not supported by the record.

enforce its rights and remedies thereunder including, without limitation, terminating the Contract and retaining Purchaser's Deposit as liquidated damages.

TX 43. The Court concludes that this language satisfies the requirements of New York law.

Cases in which courts have found language in purported time of the essence notices to be ineffective are easily distinguishable. For example, in *Nehmadi v. Davis*, a seller's notice attempting to make time of the essence failed to include language alerting the buyer that failure to appear at the closing would lead to a default. *See* 63 A.D.3d at 1127. The letter also was not sent to the buyer as required by the contract, but instead to the buyer's attorney. *See id.* The Appellate Division held that the notice was ineffective. *See id.* Similarly, in *Marcantonio v. Picozzi*, the court found that two letters sent by a party attempting to convert a real estate contract into one in which time was of the essence was not "clear, distinct, and unequivocal." *See* 46 A.D.3d 522, 523–24 (2d Dep't 2007). There, the first letter did not inform the counter-party that a failure to tender payment at the closing would be a default. *See id.* at 524. While the second letter did include that information, the court held that it was sent too late to allow a reasonable time to perform. *See id.* Here, by contrast, the Plaintiff-Seller provided clear and unambiguous notice that if it failed to tender performance under the Agreement, Purchaser would be in material default and Seller would seek, *inter alia*, to retain the contract Deposit.

*      *      *

In sum, this Court finds the language in the TOE Letter is clear, distinct, and unequivocal, as required by New York law. The fact that the Plaintiff was putting the Defendant on notice that time was of the essence is apparent from the operative language. It cannot credibly be disputed that the bold-face type of the date and time, coupled with capitalizing of the phrase "time being of the essence," would put any reader on notice that time was declared to be of the essence. Second, in light of all of the circumstances, it was reasonable for the Plaintiff-Seller to

25

declare a time of the essence closing and thirteen days was reasonable notice. Finally, unlike the letters sent in *Nehmadi* and *Marcantonio*, the TOE Letter here satisfies the third factor by clearly alerting the Defendant that failure to tender performance under the Agreement on Law Day would constitute a material default. The Court therefore concludes that Plaintiff-Seller properly declared that time was of the essence with respect to the July 28 closing.

### B. Plaintiff-Seller Properly Tendered Performance on Law Day

Plaintiff-Seller has satisfied its burden to prove that it tendered performance on Law Day. The closing ceremony was attended by, among others, Seller's Mr. Ambalu [*see* 8/16 Trial Tr. 75:15–16], Purchaser's Mr. Brunner [*see* 8/17 Trial Tr. 36:16–20], counsel for each side [*see* TX 47], and Robert Schroeder on behalf of the title company, Royal Abstract. *See* TX 47 at 6:5–6. During the closing ceremony, the Plaintiff-Seller tendered documents effectuating its performance under the Agreement. *See* TX 47 at 16:11–20:6; *see also* 8/16 Trial Tr. 76:25–77:10. Based on the tender made on behalf of the Plaintiff-Seller, the representative of the title company cleared title and confirmed that Plaintiff-Seller was in a position to convey title. *See* TX 47 at 28:25–29:20; *see* also 8/16 Trial Tr. 76:17–18; TX 47 at 35:19–20; 8/17 Trial Tr. 217:6–20; 210:11–23.

The Defendant-Purchaser nonetheless disputes that Plaintiff-Seller was ready, willing, and able to close on June 30. *See* Def. Post-Tr. Br. at 7–8. The Defendant relies heavily on the Plaintiff's failure to return the Deposit to the IOLA account until June 30, 2015 to support its argument that while the Defendant-Purchaser was ready, willing, and able to close during those times, the Plaintiff had neither the intention nor the ability to close in April or in June. *See id.* at 14. The Defendant maintains that it was only once the Deposit was returned to the IOLA account that the Plaintiff declared a time is of the essence closing. *See id.* at 14–15.

26

It is true, as Defendant-Purchaser argues, that Plaintiff-Seller likely was not ready, willing, and able to close in the April-May timeframe initially contemplated by the Parties since Plaintiff-Seller had spent the contract Deposit on an unrelated transaction. *See* 8/17 Trial Tr. 31:7–25. However, the adjournments of the closings in April and May were consensual, or at a minimum unopposed. At that point, the Parties were working cooperatively. As Mr. Brunner testified, Defendant-Purchaser was trying to be reasonable. *See* 8/17 Trial Tr. 33:12–14. And, the record makes clear that while Defendant-Purchaser now professes that it was prepared to close in April/May without any assignment of the Agreement, in fact, Defendant-Purchaser's attorney was working as early as February 2015 with Mr. Nesenoff, the attorney for the would-be assignee Mr. Lalezarian. *See* TX 2; *see also* Def. Post-Tr. Br. at 5. The Court finds that it was the behind the scenes unsuccessful negotiations by the Defendant-Purchaser with the assignee that caused the closing on the Agreement not to go forward on June 30 and Defendant-Purchaser ultimately to breach the Agreement by failing to tender performance on Law Day.

The Defendant also argues that the tender of title by Plaintiff-Seller at the July 28th closing was a sham. *See* Defendant's Post-Tr. Br. at 17. The Defendant complains that "the Debtor enlisted its own title closer to "rubberstamp" the tender of title, even though the Contract required Purchaser's choice of title company." *Id.* As a threshold matter the Court does not find that Plaintiff's use of its own title company to be inappropriate given the history of the dealings between the Parties. Initially, the Parties were using Reliable Abstract. *See* 8/16 Trial Tr. 36:9–17; *see also* TX 38; 8/16 Trial Tr. 53:4–54:10. However, on the eve of the June 30 scheduled closing, Reliable advised Seller's counsel—who was attempting to prepare the closing documents and had requested a title report [8/16 Trial Tr. 63:2–9]—that Defendant-Purchaser's counsel had told the title company to "hold off." *See* TX 42; *see also* 8/16 Trial Tr. 69:11–70:13.

Counsel to Defendant-Purchaser told Mr. Ambalu that the Defendant-Purchaser would be using a different title company. *See* TX 42; *see also* 8/16 Trial Tr. 70:17–24. Thereafter, Seller's Mr. Ambalu suddenly was contacted in July by a representative from Cornerstone Abstract seeking information in preparation for a closing on behalf of the assignees. *See* 8/16 Trial Tr. 71:14–72:8. It was reasonable for the Plaintiff-Seller to retain its own title company, Royal Abstract, in anticipation of Law Day, given the Plaintiff-Seller's suspicions regarding an unauthorized assignment and the Defendant-Purchaser's unexplained instructions to Reliable Abstract not to prepare further for the closing, and the Purchaser's non-committal attitude about scheduling a closing.

The Defendant further contends that Plaintiff-Seller's tender was not adequate and raises a number of complaints in this regard. Specifically, Defendant-Purchaser claims that no legal description was attached to the deed. Moreover, the Defendant argues that the Plaintiff-Seller failed to deliver sufficient representations and warranties and estoppels, which were conditions precedent to the Purchaser's obligation to perform under the contract. Along the same lines, Defendant-Purchaser's real estate attorney, Mr. Hansen, testified that, at the closing, he raised a number of objections to the Plaintiff-Seller's tender, including that the ACRIS documents omitted certain information [*see* 8/17 Trial Tr. 188–89], the payoff letter was outdated [*see* 8/17 Trial Tr. 190–92], the title affidavit did not remove the tenants-in-possession exception from the title report [*see* 8/17 Trial Tr. 199–201], the Plaintiff-Seller failed to deliver organizational documents that were acceptable to the title company [*see* 8/17 Trial Tr. 201], and the closing statement listed the $350,000 fee, even though the Defendant maintained there would be no assignment [*see* 8/17 Trial Tr. 204–07].

In response, Plaintiff-Seller maintains that it made a complete tender at the July 28th

closing, which was confirmed by the title closer during the ceremony. TX 47 at 28:25–29:11.

The Plaintiff-Seller argues in the alternative that even if there were "certain minor deficiencies,"

they were curable and thus did not amount to a default under the contract. *See* Plaintiff's Post-Tr.

Br. at 23; *see also* TX 47 at 35:18–23.

The Court did not find Mr. Hansen's testimony credible, and cannot conclude that any

minor deficiencies rendered the Plaintiff-Seller's tender at the July 28th closing insufficient. For

example, Mr. Hansen refused to concede that attaching the description of the Property to the

deed was a ministerial act. *See* 8/17 Trial Tr. 219:11–16. And yet, the legal description was

attached to the Agreement as Schedule A [*see* TX 1], and was apparently present at the July 28

closing. *See* 8/17 Trial Tr. 209:17–23; *see also* Plaintiff's Post-Tr. Br. at 14. It is undisputed that

the title closer found the deed sufficient "once [he] attached the legal description." TX 47 at

16:17–21. The Court finds that physically attaching the description was a ministerial act easily

performed at the July 28 closing. As such, the failure to have the description attached to the deed

prior to the closing cannot void the Plaintiff-Seller's tender. Similarly, Mr. Hansen took issue

with the estoppels provided by the Plaintiff-Seller with respect to the leases at the Property.[18]

*See* TX 47 at 23:23–25:5. Paragraph 5(b) of the Agreement required the Plaintiff-Seller to

"utilize good faith efforts to obtain from each tenant" an estoppel. *See* TX 1, ¶ 5(b). The

Defendant-Purchaser argues that the estoppels relating to the leases at the Property (one with the

General Services Administration, or "GSA," and another with a dollar store) did not conform to

---

[18] Mr. Nesenoff testified that a "[t]enant's estoppel is a document that will be executed by a tenant which would be a
recitation of facts relating to the lease that the party to whom the estoppel certificate was issued to could rely upon in
taking either an assignment of lease requiring [sic] the property or becoming a counter party or a lender with respect
to that lease." 8/16 Trial Tr. 225:13–18; *see also* 8/17 Trial Tr. 193:9–11. A form of tenant estoppel was attached to
the Agreement as Exhibit F. *See* TX 1.

Exhibit F of the Agreement. *See* TX 58; TX 59; TX 47 at 23:23–25:5. And yet, Mr. Hansen conceded at trial that Plaintiff-Seller was not obligated under the Agreement to get an estoppel from each tenant, but rather to use good faith efforts to do so. *See* 8/17 Trial Tr. 220:9–15. The evidence is clear that the Plaintiff-Seller utilized good faith efforts to obtain estoppels from both tenants at the Property [*see* 8/16 Trial Tr. 42:3–15; 8/16 Trial Tr. 43:14–23] as required by the Agreement.[19] In addition, Plaintiff-Seller's Mr. Ambalu had turned over the actual leases to Defendant-Purchaser's attorney Mr. Zwick. *See* 8/16 Trial Tr. 34:12–22.

In short, Defendant-Purchaser seems to be reaching for purported deficiencies in the documentation that Plaintiff-Seller provided in order to distract from Defendant-Purchaser's failure to tender performance at the Law Day closing. The Court finds that any such deficiencies were immaterial and/or curable. Most significantly, there can be no dispute that the title company cleared title to the Property. *See* TX 47 at 29:19–20; *see also* 8/17 Trial Tr. 210:17–23. The Court therefore finds that Plaintiff-Seller has met its burden to establish that it was ready, willing, and able to close on July 28th.

### C. Defendant's Failure to Close on Law Day Was a Material Breach of the Agreement

Having concluded that the TOE Letter validly converted the transaction into one in which time was of the essence and that Plaintiff-Seller was ready, willing, and able to close on Law Day, the dispositive question is, as Defendant itself recognizes [*see* Def. Post-Tr. Br. at 1], whether the Defendant breached the Agreement on Law Day. The Court finds that the Defendant-Purchaser was not ready, willing, and able to tender performance on Law Day and

---

[19] There is uncertainty as to the precise identity of the tenant under the dollar store lease. *See* 8/16 Trial Tr. 134:16 – 135:12; *see also* TX P; 8/16 Trial Tr. 133:2–13. This, however, does not undermine the Plaintiff-Seller's good faith efforts to obtain the estoppels in accordance with paragraph 5(b) of the Agreement.

concludes that the Defendant's failure to tender performance on July 28, 2015 constitutes a material breach of the Agreement.

The record reflects that as late as the day before Law Day, Defendant-Purchaser was seeking financing to close on the sale. It is undisputed that on July 27, Defendant-Purchaser reached out to Sterling Bank, with whom it previously had been in contact, to inquire about a potential loan to Purchase the Property. *See* TX 46. The bank responded that it needed additional information and would prepare a list of open items in connection with a potential loan. *See* TX 46. Purchaser's Mr. Brunner testified that Sterling Bank was not ready to close on a loan on July 28. *See* 8/17 Trial Tr. 63:24–25.

Plaintiff-Seller established at trial and it is undisputed that Defendant-Purchaser entered the closing not with a check [*see* 8/17 Trial Tr. 215:20–25], but instead with a complaint commencing an action against the Plaintiff in state court and a tablet PC on which it displayed bank account information for entities that were not the Purchaser under the Agreement. *See* 8/17 Trial Tr. 37:21–24; *see also* 8/17 Trial Tr. 17:14–17; 8/17 Trial Tr. 74:3–6. Manifestly, displaying on a tablet PC at a closing that there purportedly was sufficient money in an account of someone other than the Purchaser to cover the purchase price and closing costs does not constitute tender of the purchase price as required by the Agreement. Moreover, it is undisputed that no bank accounts ever have been opened in the Defendant's name [*see* 8/17 Trial Tr. 17:14–17; *see also* 8/17 Trial Tr. 73:21–74:6] and that Defendant-Purchaser did not tender funds at the closing to close on the transaction. *See* 8/16 Trial Tr. 92:21–25; *see also* 8/17 Trial Tr. 65:23–66:20. As such, the Plaintiff has met its burden of proving that Defendant-Purchaser breached the Agreement.

In light of the Plaintiff having made out a *prima facie* case that the Defendant was in breach, the burden shifts to the Defendant to prove that it was ready, willing, and able to tender the purchase price at the closing. *See, e.g.*, *No. 1 Funding Ctr., Inc. v. H & G Operating Corp.*, 48 A.D.3d 908, 910–11, 853 N.Y.S.2d 178, 182 (3d Dep't 2008); *Fridman v. Kucher*, 34 A.D.3d 726, 728, 826 N.Y.S.2d 104, 105 (2d Dep't 2006); *Goller Place Corp. v. Cacase*, 251 A.D.2d 287, 288, 672 N.Y.S.2d 923  (2d Dep't 1998). There is no dispute that:

- the Defendant did not bring funds, in the form of a check or otherwise, to the closing [*see* 8/16 Trial Tr. 92:21–25; *see also* 8/17 Trial Tr. 65:23–66:20; 8/17 215:17–25];

- Defendant-Purchaser merely displayed on a tablet PC bank records of various entities and/or individuals other than Defendant-Purchaser [*see* 8/17 Trial Tr. 37:21–24];[20]

- there was no bank account in the name of Defendant-Purchaser [*see* 8/17 Trial Tr. 17:14–17; *see also* 8/17 Trial Tr. 74:3–6];

- Defendant-Purchaser had not obtained a loan from a bank and potential mortgagee Sterling Bank was not ready to close on July 28 [*see* 8/17 Trial Tr. 63:24–25]; and

- the evidence regarding the attempted assignment of the Agreement suggests that the flip transaction might have provided funds for Defendant to close under the Agreement. However, as noted above, the Defendant never came to an agreement with the flip counter-party (Mr. Lalezarian) on a price, there was no signed assignment agreement [*see* 8/16 Trial Tr. 156:23–157:21], and any agreement could not be effectuated unless the Defendant-Purchaser obtained the Plaintiff-Seller's consent for which Defendant-Purchaser was not willing to pay.

---

[20] Defendant's witness testified that at some point in the afternoon of Law Day, Purchaser's Mr. Brunner reached out to his personal bank, Investor's Bank, and asked the assistant branch manager to verify the total in all of the various accounts that Mr. Brunner maintained. *See* 8/17 Trial Tr. 84:24–86:7; *see also* 8/17 Trial Tr. 72:5–23. The assistant branch manager, Ms. Donskaya, testified that she had reviewed various accounts and understood that these were all of Mr. Brunner's personal and business accounts, but she did not recall how many accounts there were or if any of the accounts were in the name of Defendant-Purchaser, and she did not know if Mr. Brunner had partners in any of the businesses whose accounts she reviewed. *See* 8/17 Trial Tr. 88:19–89:20. At times, Ms. Donskaya appeared simply to be reading from a document received not as a business record, but only for the limited purpose of showing its receipt by Mr. Brunner. *See* 8/17 Trial Tr. 38:21–39:5; *see also* 8/17 Trial Tr. 87:20–90:11. The Court finds that Ms. Donskaya's testimony does not support, and indeed undercuts, Defendant-Purchaser's claim that it had sufficient funds to close and was ready, willing, and able to tender performance on Law Day.

The only reasonable inference to be drawn from the evidence is that the Defendant-Purchaser did not have the funds to close on the transaction on Law Day. The Court therefore finds that the Defendant has failed to demonstrate its ability or willingness to close on Law Day. The Court concludes that by failing to tender the purchase price at the valid time is of the essence closing, the Defendant materially defaulted on the Agreement.

### D. Plaintiff-Seller is Entitled to Retain the Contract Deposit As Damages and Defendant-Purchaser Is Not Entitled to Specific Performance Or Money Damages On Its Counterclaim

#### (1) Plaintiff-Seller is Entitled to Judgment Awarding Contract Deposit as Liquidated Damages

Pursuant to the express terms of the Agreement, the Plaintiff is entitled to retain the Deposit as liquidated damages. *See* TX 1, ¶ 15. Numerous cases make clear that the non-breaching party may retain a contract deposit without regard for or a showing of actual damages. *See, e.g.*, *Maxton Builders, Inc. v. Lo Galbo*, 68 N.Y.2d 373, 378, 502 N.E.2d 184, 186 (1986); *Uzan v. 845 UN Ltd. P'ship*, 10 A.D.3d 230, 238, 778 N.Y.S.2d 171, 176 (1st Dep't 2004); *Armas v. Yuska*, 2 A.D.3d 660, 661, 768 N.Y.S.2d 641 (2d Dep't 2003). Indeed, "[u]nlike some other jurisdictions, New York maintains the rule that the seller of real property may retain the full down payment in the event of the buyer's breach, regardless of whether that sum bears any relation to the seller's expected loss." *Spirit Locker, Inc.*, 696 F. Supp. 2d at 307 (E.D.N.Y. 2010) (citing *Maxton Builders, Inc.*, 68 N.Y.2d 373, 381–82, 509 N.Y.S.2d 507, 502 N.E.2d 184 (1986); *Collar City P'ship I v. Redemption Church of Christ of the Apostolic Faith*, 235 A.D.2d 665, 651 N.Y.S.2d 729, 730 (3d Dep't 1997); *see, e.g.*, *No. 1 Funding Ctr., Inc. v. H & G Operating Corp.*, 48 A.D.3d 908, 910–11, 853 N.Y.S.2d 178, 182 (3d Dep't 2008) (holding seller entitled "to retain all moneys it received from [purchaser] pursuant to the contract" where purchaser "submitted no documentation or other evidence establishing that it had the funds necessary to purchase the property on the date of the closing."); *Goller Place Corp. v. Cacase*,

251 A.D.2d 287, 288, 672 N.Y.S.2d 923 (2d Dep't 1998) (holding purchaser failed to make

*prima facie* showing of entitlement to specific performance where purchaser "submitted no

documentation or other proof to substantiate his assertion that he had the funds necessary to

purchase the property and thus, [was] unable to prove that he was ready, willing, and able to

close the sale as a matter of law.").

### (2) *Defendant-Purchaser's Counterclaim for Relief is Dismissed*

Under New York law, a party seeking specific performance of a contract must show that

"it was ready, willing and able to fulfill its contractual obligations." *ADC Orange, Inc. v. Coyote*

*Acres, Inc.*, 7 N.Y.3d 484, 490, 857 N.E.2d 513, 517 (2006) (internal citations omitted); *see also*

*Goller Place Corp. v. Cacase*, 251 A.D.2d 287, 288, 672 N.Y.S.2d 923 (2d Dep't 1998).

Specifically, "[a] purchaser who seeks specific performance of a contract for the sale of real

property must demonstrate that he or she was ready, willing, and able to perform the contract,

regardless of any anticipatory breach by a seller." *Fridman v. Kucher*, 34 A.D.3d 726, 727, 826

N.Y.S.2d 104, 106 (2d Dep't 2006); *but see DBAG, Inc.*, 305 A.D. 2d 472, 473, 760 N.Y.S.2d

193, 194 (2d Dep't 2003) (while "purchasers who seek specific performance must ordinarily

show that they are ready, willing, and able to perform, such proof is not required where the

necessity for such a tender was obviated by acts of the other party amounting to an anticipatory

breach of the contract."); *cf. Ilemar Corp. v. Krochmal*, 44 N.Y.2d 702, 703, 376 N.E.2d 917,

917 (1978) ("Tender of performance by the purchaser is excused only if the title defect is not

curable, for in such a case it would serve no purpose to require the purchaser to go through the

futile motions of tendering performance."). Thus, Defendant-Purchaser has the burden of proving

that it was ready, willing, and able to close on Law Day in order to make out a *prima* facie

showing it is entitled to specific performance.

The Defendant-Purchaser concedes that if the Court were to determine that Purchaser was not ready, willing, and able to close, Purchaser is foreclosed from seeking specific performance under the Agreement. *See* Def. Post-Tr. Br. at 24. Defendant-Purchaser's acknowledgement that the Court may find it was not ready, willing, and able at the closing is also fatal to its claim for money damages. *See, e.g.*, *3801 Review Realty LLC v. Review Realty Co. LLC*, 111 A.D.3d 509, 510, 975 N.Y.S.2d 36, 37 (1st Dep't 2013) (concluding a party's "inability to demonstrate that it was ready, willing and able to fulfill its contractual obligations at closing also precludes it from recovering money damages." (internal citation omitted)). And, the Agreement explicitly provides that while the Purchaser may commence an action for specific performance if the Seller "willfully fails to tender title," "under no circumstances may Purchaser sue Seller for damages (actual or consequential)." *See* TX 1, ¶ 15(a). Defendant nonetheless seeks money damages. *See* Ans. ¶ 27. Under New York law, "a buyer in a damages suit . . . must show that it was ready, willing and able to close the transaction—*i.e.*, that but for the seller's repudiation, the transaction could and would have closed." *See Pesa v. Yoma Dev. Grp., Inc.*, 18 N.Y.3d 527, 531, 965 N.E.2d 228, 230 (2012).

As set forth above, Plaintiff has established both that Plaintiff-Seller tendered performance at the closing and that Defendant-Purchaser was not ready, willing, and able to close on Law Day. The Defendant-Purchaser has not rebutted this showing by proving that it was ready, willing, and able to close on Law Day. Accordingly, the Defendant is not entitled to specific performance or money damages.

## **CONCLUSION**

For the foregoing reasons, the Court concludes that Defendant-Purchaser materially breached the Agreement by appearing at, but refusing to proceed with, the closing on Law Day.

The Plaintiff-Seller is entitled to retain the $7.5 million contract Deposit as liquidated damages pursuant to the Agreement. Judgment should be entered in favor of the Plaintiff-Seller, the Debtor, in the amount of $7.5 million and the Defendant's counter-claims should be dismissed.

Counsel for the Plaintiff-Seller shall prepare and settle a judgment consistent with this Opinion within 14 days in accordance with Local Bankruptcy Rule 9074-1.

**IT IS SO ORDERED**.

Dated: New York, New York
        August 25, 2017

                                        *s/ Mary Kay Vyskocil*
                                        Honorable Mary Kay Vyskocil
                                        United States Bankruptcy Judge